FILED
IN OPEN COURT
OCT - 6 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID J. RUSH,<br><br>*Defendant.* | Case No. 1:26-CR-185<br><br>Count 1: Wire Fraud<br>18 U.S.C. § 1343<br><br>Forfeiture Notice |

INFORMATION

THE UNITED STATES ATTORNEY'S OFFICE CHARGES THAT:

At all times relevant to this Information:

GENERAL ALLEGATIONS

**The Defendant and Relevant Persons and Entities**

1. Since approximately June 2010, and at all times relevant to this Information, defendant DAVID J. RUSH ("RUSH") was employed by an agency within the United States Government ("Government Agency 1"). Over the course of his employment at Government Agency 1, RUSH held senior positions involving highly sensitive and classified government programs.

2. By virtue of his positions, RUSH possessed significant authority over government programs and expenditures. Among other things, RUSH could initiate and direct funding requests, instruct government contractors concerning certain government programs, and approve or cause the approval of substantial expenditures of United States government funds.

3. In connection with the conduct charged in this Information, RUSH exercised control over expenditures that he himself had requested or directed and, on multiple occasions, acted as his own approving official for transactions involving substantial amounts of United States government money.

4. "Company 1" was a company that contracted with the United States Government, including Government Agency 1, to provide services in support of government activities. During the relevant period, Company 1 supported activities for which RUSH exercised substantial responsibility and authority.

5. "Individual 1" was a senior executive of Company 1 who worked at an office in Loudoun County, Virginia, within the Eastern District of Virginia, and interacted with RUSH concerning certain transactions described below.

6. "Individual 2" was an employee of Company 1 who worked at an office in Loudoun County. At RUSH's direction, Individual 2 initiated, or caused the transmission of, wire transfers and transmitted, or caused the transmission of, purchase orders, invoices, and other electronic documentation relating to expenditures that RUSH represented were required for legitimate classified government activities.

7. "Company 2" was a company that provided services in support of United States government activities and, during the relevant period, served as a subcontractor to Company 1.

8. "Individual 3" was a senior executive of Company 2 who interacted directly with RUSH concerning certain transactions described below, including the acquisition and delivery of gold bars.

9. "Individual 4" was an independent subcontractor who had worked with RUSH on government-related matters for several years. As described below, RUSH directed Individual 4 to

assist with the acquisition of luxury real estate and other property based upon RUSH's representations that the acquisitions were required for legitimate government purposes.

10. "Holding Company 1" was a limited liability company established by Individual 4 at RUSH's direction. Government-derived funds were transferred to a bank account held by Holding Company 1, which was used to receive and disburse funds associated with the fraudulent activities alleged in this Information.

**Rush's Manufactured Bona Fides**

11. From the beginning of his employment at Government Agency 1, RUSH presented himself to colleagues and contractors as a combat veteran with academic credentials.

12. Among RUSH's claims were assertions that he was a military pilot who held a bachelor's degree from a large public research university located in South Carolina and a doctoral degree from a private research university in New York.

13. These and other representations concerning RUSH's military and academic accomplishments were false. In reality, RUSH did not graduate from these universities and was never a pilot in the U.S. military.

14. RUSH did serve in the U.S. military; however, his actual military service differed materially from the military service that he represented to Government Agency 1, colleagues, contractors, and others. RUSH served in the United States Navy and was honorably discharged from the reserves effective February 1, 2015.

15. After February 1, 2015, RUSH was no longer serving in the military.

16. Based on RUSH's fictitious education and military background, as well as his legitimate and successful work within Government Agency 1, RUSH rose to senior executive

positions within Government Agency 1. These positions gave RUSH authority to approve multimillion-dollar expenditures on behalf of and in furtherance of legitimate programs.

## **COUNT ONE**

(*Wire Fraud*)

17. The allegations contained in paragraphs 1–16 of this Information are realleged as if fully set forth herein.

### THE SCHEME AND ARTIFICE

18. From at least in and around October 2025 through in and around May 2026, within the Eastern District of Virginia and elsewhere, RUSH did knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and transmit and cause to be transmitted writings, signs, signals, and sounds by means of wire communication in interstate commerce.

19. The object of the scheme and artifice was for RUSH to maximize his personal wealth and enrichment by using his positions within Government Agency 1 to amass personal property and assets purchased with United States government funds.

20. As part of the scheme, RUSH fabricated two separate purported government activities to justify the acquisition of assets for his personal benefit. First, RUSH fabricated a highly classified program to justify the acquisition of luxury real estate in South Florida, which he then intended to resell for personal profit. Second, RUSH fabricated a separate purported sensitive government activity to justify the acquisition of gold bars. Neither activity existed, and RUSH was not authorized to acquire those assets as he claimed.

21. Although the real estate and gold acquisitions involved different transactions and intermediaries, they were executions of the same overarching scheme—RUSH created false classified authorities, directed and approved the associated expenditures, caused contractors and subcontractors to carry out the transactions, and thereafter exercised possession or control over the acquired assets.

## MANNER AND MEANS

22. To accomplish the object of this scheme, RUSH used the following manners and means, among others:

### Rush Fabricated a Classified Government Program

23. A Special Access Program ("SAP") is a program that imposes safeguarding and access requirements that exceed those normally required for information at the same classification level. Access to a SAP is restricted to specifically authorized individuals with the appropriate security clearance and need to know.

24. A "read-in" is the process through which an authorized individual is formally granted access to a SAP. A legitimate read-in may include security instructions regarding the handling and dissemination of protected information and the execution of a non-disclosure agreement.

25. As a principle means of executing the scheme, RUSH falsely made material representations that expenditures he directed were required for a highly classified government program, referred to herein as SAP #1. RUSH falsely claimed that SAP #1 existed and further claimed that its purpose involved the purchase of real property in and around parts of Southern Florida.

26. SAP #1 was not a legitimate government program.

27. RUSH nevertheless purported to "read in" selected contractors and subcontractors to SAP #1, thereby representing that they had been granted access to an actual classified government program.

28. Among those whom RUSH purported to "read in" were Individuals 1, 2, and 4.

29. RUSH told the individuals he "read in" that only a small number of people knew about SAP #1 and instructed them not to discuss the purported program with anyone who had not also been "read in."

30. RUSH further represented to Individuals 1, 2, and 4 that highly placed United States government officials knew about or authorized SAP #1 and the fake program's purported activities.

31. In fact, SAP #1 was not an authorized government program, and RUSH lacked authority to use United States government funds to acquire the property described below for his own enrichment.

**Rush Directed and Approved the Expenditures**

32. RUSH personally directed and approved expenditures associated with the purported SAP #1.

33. RUSH caused payment requests for tens of millions of dollars at a time to be entered into Government Agency 1 systems and directed that these funds be delivered through Company 1.

34. RUSH approved multiple payment requests that he himself had initiated or directed in this way. By doing so, RUSH effectively acted as his own approving official, enabling him to expend substantial amounts of United States government money without meaningful scrutiny.

35. On one occasion in approximately January 2026, RUSH sought the release of more than $100 million from a government contract associated with Company 1 to fund his fraudulent

scheme.

36. Acting at RUSH's direction, Individual 2, while working from Company 1's office in Loudoun County, Virginia, initiated electronic wire transfers and transmitted purchase orders and other electronic documentation associated with the transactions.

37. The electronic wire transfers traveled to servers that were located outside of the Commonwealth of Virginia.

**Rush Caused Government Funds to Be Routed Through Holding Company 1**

38. RUSH directed Individual 4 to establish Holding Company 1 and a corresponding bank account for use in connection with the purported SAP #1.

39. Individual 4 did so because he believed RUSH's false representation that Holding Company 1 was required for a legitimate classified United States government program.

40. At RUSH's direction, Holding Company 1 submitted invoices to Company 1 describing the product or service as "Consulting."

41. Between in and around November 2025 and in and around March 2026, RUSH caused Company 1 to transfer approximately $145 million to Holding Company 1 in multiple financial transactions.

42. Individual 2 initiated each of those transfers from Company 1's office in Loudoun County, Virginia, within the Eastern District of Virginia and were processed by servers located outside of the Commonwealth of Virginia.

43. RUSH thereafter directed how those funds were to be used, including directing the acquisition, renovation, improvement, and contemplated resale of luxury residential real estate.

**RUSH Used Government Funds to Acquire Luxury Real Estate**

44. RUSH caused government money to be used to acquire four luxury real properties

in Palm Beach and Hobe Sound, Florida.

**PROPERTY 1**

45. In and around December 2025, RUSH caused funds that he had fraudulently obtained from the United States Government through Company 1 and Holding Company 1 to be used to acquire Property 1, a luxury residential property in Palm Beach, Florida.

**PROPERTY 2**

46. In and around mid-December 2025, RUSH caused government funds routed through Holding Company 1 to be used to acquire Property 2, a luxury real property in Palm Beach, Florida.

**PROPERTY 3**

47. In and around January 2026, RUSH caused government funds routed through Holding Company 1 to be used to acquire Property 3, a luxury residential property in Palm Beach, Florida.

**PROPERTY 4**

48. In and around February 2026, RUSH caused government funds routed through Holding Company 1 to be used to acquire Property 4, a luxury real property in Hobe Sound, Florida.

**Rush Used Government Funds to Acquire Gold Bars**

49. RUSH caused tens of millions of dollars in United States government funds to be used to acquire hundreds of gold bars.

50. In and around November 2025, RUSH made a material misrepresentation to Individual 2 and Individual 3 that he was working on a Top-Secret project in which he had to deliver high-value commodities to unnamed individuals.

51. RUSH told Individual 3 that the purported activity permitted the use of gold, diamonds, or cryptocurrency, and discussed those alternatives before directing Individual 3 to acquire gold.

52. In furtherance of the scheme, RUSH directed Company 1 to provide government-derived funds to Company 2 and led both Company 1 and Company 2 to believe that the expenditures were associated with a legitimate classified United States government program.

53. Acting at RUSH's direction, Individual 2 initiated the relevant transfers to Company 2 from Company 1's office in Loudoun County, Virginia.

54. Between December 2025 and February 2026, Individual 3 delivered 298 gold bars, acquired pursuant to RUSH's directions, to RUSH's office in Loudoun County, Virginia, and placed them in a safe located there.

55. Individual 3 maintained an itemized record containing identifying information and serial numbers for the 298 gold bars acquired and delivered.

56. On or about May 19, 2026, the Federal Bureau of Investigation executed a court-authorized search warrant of RUSH's residence in the Eastern District of Virginia and recovered 298 gold bars. The serial numbers of the 298 gold bars recovered from RUSH's residence matched the serial numbers recorded by Individual 3 for the gold bars purchased pursuant to RUSH's directions.

**Rush's Common Modus Operandi**

57. In acquiring both the luxury real estate and the gold bars, RUSH followed substantially the same method.

58. RUSH used his legitimate government authority and manufactured personal bona fides to create confidence in his directions.

59. RUSH made materially false representations by fabricating both SAP #1 and a separate classified activity and represented that extraordinary purchases were required to support the classified activities.

60. RUSH invoked classification and compartmentation to prevent the individuals he deceived from verifying the existence or legitimacy of the purported requirements.

61. RUSH personally initiated, directed, and approved the expenditure of government funds.

62. RUSH caused Company 1, Company 2, and other unwitting contractors and subcontractors to acquire valuable property that RUSH thereafter possessed or intended to profit from personally.

63. In this manner, the real estate and gold transactions constituted different executions of one continuing scheme, the purpose of which was RUSH's maximum self-enrichment at the expense of the United States.

EXECUTION OF THE SCHEME

64. For the purpose of executing the aforementioned scheme and artifice to defraud and attempting to execute such scheme, the defendant,

**DAVID J. RUSH**

did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of wire communications in interstate and foreign commerce, to wit: on or about January 23, 2026, the defendant caused Individual 2, from an office location in the Eastern District of Virginia, to initiate a wire transfer of approximately $45,000,000 from Company 1 to Holding Company 1's bank account, via a server located outside of the Commonwealth of Virginia, by falsely representing the material facts that there existed a SAP #1, and the defendant had authority through

Government Agency 1 to obtain money and luxury real estate for SAP #1, when in truth and in fact, as the defendant well knew then, SAP #1 was not a legitimate government program, and the defendant had no authority to obtain the government funds or direct their expenditure for the acquisition of luxury real estate as he claimed.

(All in violation of Title 18, United States Code, Section 1343.)

## FORFEITURE ALLEGATION

THE UNITED STATES ATTORNEY'S OFFICE FURTHER FINDS that there is probable cause that the property described below is subject to forfeiture.

Pursuant to Federal Rule of Criminal Procedure 32.2(a), the defendant, DAVID J. RUSH, is hereby notified that if convicted of any of the offenses set forth in Count One in the Information, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, constituting or derived from proceeds traceable to the offense.

The property subject to forfeiture includes, but is not limited to, the following:

a. a monetary judgment in the amount of at least $193,590,400.69 representing the amount of proceeds the defendant obtained as a result of the violations described in this Information;

b. $38,651,314.55 in funds seized from Bank of America Account # 6441 held in the name of 0701 Holdings LLC;

c. the real property and improvements located at 311 Polmer Park Road, Palm Beach, FL or cash in lieu of;

d. the real property and improvements located at 511 South Beach Road on Jupiter Island in Florida or cash in lieu of;

e. the real property and improvements located at 243 Seaspray Ave., Palm Beach, FL or cash in lieu of;

f. the real property and improvements located at 236 Via Las Brisas, Palm Beach, FL or cash in lieu of;

g. a 2026 BMW Alpina XB7, VIN: 5UX43EM02T9182301;

h. a 2026 BMW Alpina XB7, VIN: 5UX43EM0XT9187973;

i. 298 gold bars seized from the defendant's residence in Ashburn, Virginia on May 19, 2026;

j. $2,106,550 in U.S. Currency seized from the defendant's residence in Ashburn, Virginia on May 19, 2026;

k. €104,795 Euros seized from the defendant's residence in Ashburn, Virginia on May 19, 2026;

l. 30 watches seized from the defendant's residence in Ashburn, Virginia on May 19, 2026;

m. four watches seized from a residence in Warrenton, Virginia on June 2, 2026; and

n. one Rolex Oyster Perpetual Sea-Dweller 4000 (Model 11660), with serial number 9R22U645.

If any property that is subject to forfeiture is unavailable, the United States may seek an order forfeiting substitute assets pursuant to 21 U.S.C. § 853(p) and Federal Rule of Criminal Procedure 32.2(e).

(In accordance with Title 18, United States Code, Sections 981(a)(1)(C); Title 28, United States Code, Section 2461(c); Title 21, United States Code, Section 853(p); and Federal Rule of Criminal Procedure 32.2.)

TODD W. BLANCHE
Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

By: ______________________
Raizza K. Ty
Gavin R. Tisdale
Assistant United States Attorneys

JOHN A. EISENBERG
Assistant Attorney General for National Security

By: ______________________
Kevin Hakala
Kathryn DeMarco
Trial Attorneys
U.S. Department of Justice
National Security Division
Counterintelligence and Export Control Section